IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC.,
a Delaware corporation,

               Plaintiff,

    v.

LENOVO (UNITED STATES) INC.,
a Delaware corporation,

               Defendant.

No. 3:12-cv-01065-HZ

OPINION & ORDER

Arthur S. Beeman
Joel T. Muchmore
Arent Fox LLP
55 Second St., 21st Floor
San Francisco, CA 94105

Dayna J. Christian
Nicholas M.M. Drum
Immix Law Group
121 SW Salmon St., Ste. 1000
Portland, OR 97204

      Attorneys for Plaintiff

Eric J. Klein
Todd E. Landis
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Ave., Ste. 4100
Dallas, TX 75201

Fred I. Williams
Akin Gump Strauss Hauer & Feld LLP
600 Congress Ave., Ste. 1350
Austin, TX 78701

Kenneth L. Walhood
Blunck & Walhood LLC
2350 Willamette Falls Dr.
West Linn, OR 97068

  Attorneys for Defendant


HERNÁNDEZ, District Judge:

  Plaintiff Tranxition, Inc. owns U.S. Patent Nos. 6,728,877 (the " '877 patent") and

7,346,766 (the " '766 patent"). The claims generally recite a software method for transferring

customized user settings from an old computer to a new computer. Tranxition filed the present

infringement action against Defendant Lenovo (United States) Inc. and a separate action against

Novell, Inc. that is also before this Court (Case No. 3:12-cv-01404-HZ). The parties in the

Novell case have agreed to allow the merits of this case to proceed first.

  Currently before the Court are two motions from Lenovo seeking summary judgment of

invalidity under Section 101 of the Patent Act. Lenovo's motion for partial summary judgment

[229] attacks one specific claim in the '877 patent, while Lenovo's motion for summary

judgment [234] is broader in scope, as it attacks all of the remaining independent claims in both

of Tranxition's patents-in-suit.

  For reasons explained below, the Court finds that Tranxition's patents are aimed at a

patent-ineligible abstract idea. Neither of the patent's claims, whether read singly or in

combination, state an inventive concept sufficient to satisfy the Supreme Court's test for patentability of an abstract idea under Section 101 of the Patent Act. Therefore, Lenovo's motions for summary judgment are granted, and Tranxition's '877 and '766 patents are invalid.

## BACKGROUND

The patents at issue recite the same concept: "a method and system for automatic transitioning of configuration settings among computer systems." '877 patent, col. 1, ll. 18–21.[1] Tranxition calls this "the migration process." '877 patent, col. 1, ll. 6–7. "In today's world," the patents explain, "technology changes very quickly, [and] it is very common to replace an old computer system every few years with a new computing system." '877 patent, col. 1, ll. 24–26. A major problem with this change-over is that computer users often spend significant time customizing the settings on their old computers, and would like to transfer many of those settings to their new computers. The transferred settings could be simple, such as a custom desktop wallpaper, or sophisticated, such as network settings. '877 patent, col. 1, ll. 36–47. As the complexity of computers grows, the number of possible configuration settings and the places they might be located increases. It can take significant time and effort to find the old settings, identify where on the new system those settings are located, and then change the new system to match the old one. '877 patent, col. 1, ll. 48–62. The patents claim that "[m]any users often decide to stick with an obsolete old computer system rather than wrestle migration and manual reconfiguration required for a new computer system." '877 patent, col. 2, ll. 9–13. And, like any human process, this "transitioning" of settings from one system to the other is "prone to errors that lead to user frustration." '877 patent, col. 2, ll. 19–21.

---

[1] The two patents share a history—the '766 patent is a continuation of the patent application that later became the '877 patent—and the same title, abstract, and specification. For background purposes, the Court cites only to the '877 patent, and refers the reader to the same columns and lines of the '766 patent without a duplicate parallel citation.

The patents aim to address this problem by "automatically determin[ing] configuration settings customized by a user or network administrator on a[n] old computer system," and providing "an automatic migration of configuration settings from an old computer system to a new computing system without using a time consuming manual migration process." '877 patent, col. 2, ll. 38–44.

The method and system claims that make up the patents describe how the invention achieves automatic migration. First, it identifies the various configuration settings, which include Internet browser settings, a desktop "look and feel," user preferences, e-mail address books, folder names and locations, passwords, registry settings, and more. '877 patent, col. 17, ll. 65–67; col. 18, ll. 1–23. It then identifies the locations of these various settings, and allows the user to select the settings he or she would like to transfer to the new computer. '766 patent, col. 17, ll. 56–62. Next, the invention retrieves the chosen settings, and completes the personality transfer by "manipulating" and "transitioning" the configuration settings to the new computer system. '877 patent, col. 17, ll. 55–62; '766 patent, col. 17, ll. 63–67; col. 18, ll. 1–3.

Between the '877 patent and the '766 patent, there are five independent claims that describe the invention's technological concepts—Claims 1, 16, and 30 of the '877 patent, and Claims 1 and 42 of the '766 patent. The remaining claims that are the subject of Lenovo's motions and this Opinion & Order are dependent, either directly or indirectly, of those claims. Plaintiff's Response to Defendant's Motion for Summary Judgment II ("Pl. Resp. II"), ECF No. 250, at 4–5.

In total, Lenovo asks for summary judgment of invalidity on claims 1–12, 15–26, 29, and 30 of the '877 patent, and claims 1–3, 5–11, 15, and 42–44 of the '766 patent. Lenovo moved separately for summary judgment of invalidity against Claim 30 of the '877 patent, see

Defendant's Motion for Summary Judgment ("Def. Mot. I"), ECF No. 229, and against the other

claims (hereinafter the "Primary Claims"). See Defendant's Motion for Summary Judgment

("Def. Mot. II"), ECF No. 234. Lenovo's asserted grounds for invalidity are the same, however,

against both the Primary Claims and Claim 30. Lenovo argues that the claims are unpatentable

under Section 101 of the Patent Act because they are directed at an abstract idea and they do not

contain an "inventive concept sufficient to transform the claimed abstract idea into a patent-

eligible subject matter." Def. Mot. II at 1 (quoting Alice Corp. Pty. Ltd. v. CLS Bank, Int'l, 134

S. Ct. 2347, 2357 (2014)). Tranxition contends that the patents disclose a "computer-based

solution to a uniquely computer problem," which is either not abstract, or is sufficiently

inventive to be worthy of patent protection. Pl. Resp. II at 1–2.

Since the law governing the two motions is the same, this Opinion & Order resolves both

of Lenovo's motions.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of " 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011).

## DISCUSSION

### 1. Applicable Law

Section 101 of the Patent Act is the starting point for patentability, and provides that

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

subject to the conditions and requirements of this title." 35 U.S.C. § 101. From this sweeping

statute, the Supreme Court has carved out as not patentable three broad subjects: "laws of nature,

natural phenomena, and abstract ideas." Bilski v. Kappos, 561 U.S. 593, 601 (2010) (quoting

Diamond v. Chakrabarty, 447 U.S. 303, 308 (1980)). Allowing patents over these "basic tools of

scientific and technological work" would impede, not promote innovation. Alice,134 S. Ct. at

2354 (quotation marks omitted); see also U.S. CONST. ART. I, § 8, cl. 8 (granting Congress the

power to "promote the Progress of Science and useful Arts"). The High Court has "repeatedly

emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up

the future use of these building blocks of human ingenuity." Alice, 134 S. Ct. at 2354 (quotation

marks omitted).

But courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law" because, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Id. (citing Mayo, 132 S. Ct. at 1293) (quotation marks omitted). An invention that involves or invokes an abstract concept can be patentable, so long as it applies such a concept "to a new and useful end" or integrates these "building blocks into something more." Id. (quotation marks omitted).

The Supreme Court in Mayo and Alice set out a two-step analytical framework for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." Alice, 134 S. Ct. at 2355 (citing Mayo, 132 S. Ct. at 1293–94). First, the court must "determine whether the claims at issue are directed to one of the patent-ineligible" categories. DDR Holding, LLC v. Hotels.com L.P., 773 F.3d 1245, 1255 (Fed. Cir. 2014) (citing Alice, 134 S. Ct. at 2355). If so, the court then examines "the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea." Id. (citing Alice, 134 S. Ct. at 2355). This second step is the search for an "inventive concept," or some "element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' that a patent on an ineligible concept." Id. (quoting Alice, 134 S. Ct. 2355). A claim that recites an abstract idea must include "additional features" to ensure "that the [claim] is more than a drafting effort designed to monopolize" the abstract idea. Alice, 134 S. Ct. at 2357 (quoting Mayo, 132 S. Ct. at 1297).

Distinguishing between a patent-eligible claim and an ineligible one can be difficult, especially in the realm of computer technology and software patents. Id.; see also Intellectual Ventures II LLC v. JP Morgan Chase & Co., No. 13-cv-3777 (AKH), 2015 WL 1941331 at *5

(S.D.N.Y. Apr. 28, 2015) (explaining that in analyzing software patents, courts must "be careful not to mistake a difficulty in conceptualizing an esoteric-but potentially patent-eligible invention with a patent-ineligible abstraction.").

### 2. Presumption of Validity & Evidentiary Standard

Before analyzing the merits of the claims, the Court first addresses Tranxition's contention that "a party seeking to invalidate a patent must overcome the strong presumption of validity with clear and convincing evidence." Pl. Resp. II at 5 (citing United States Gypsum Co. v. Nat'l Gypsum Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996)) (additional citations omitted). Tranxition criticizes Lenovo for only offering "conclusory attorney argument" in support of its motion, and argues that Lenovo "falls far short of its burden to establish by clear and convincing evidence that Patents-in-Suit are invalid as abstract." Pl. Resp. II at 1–2, 34.

Tranxition's argument fails for two reasons. First, the Federal Circuit has explained that the presumption of validity is now "unwarranted" when "assessing whether claims meet the demands of Section 101." Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 720 (Fed. Cir. 2014). The presumption of patent validity is based on deference to the United States Patent and Trademark Office's expertise in approving the claim as patentable. Id. However, in light of recent Supreme Court decisions in Mayo and Alice that have "unequivocally repudiated the overly expansive approach to patent eligibility" under Section 101, the Federal Circuit has explicitly stated that "while the presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the Section 101 calculus." Id. at 720–21 (citing Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2243–47 (2011)); see also Modern Telecom Sys. LLC v. Earthlink, Inc., No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015) (declining to apply presumption of validity under Section 101); Wireless Media

Innovations, LLC v. Maher Terminals, LLC, No. CIV.A. 14-7004, 2015 WL 1810378, at *5–6 (D.N.J. Apr. 20, 2015) (same).

Second, the Court fails to see how the "clear and convincing" standard applies to the validity analysis under Section 101 in this case. The Federal Circuit has held that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d 1269, 1304 (Fed. Cir. 2013) cert. granted, 134 S. Ct. 734 (2013) and aff'd, 134 S. Ct. 2347 (2014). However, the application of that standard was based on the presumption of validity that previously attached to patents challenged under Section 101 which, as explained above, is now "unwarranted" in light of more recent Supreme Court decisions. See id. ("Because we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 . . . we find that any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence.").

Furthermore, recent decisions from the Supreme Court and the Federal Circuit invalidating patents under Section 101 have not mentioned or applied the "clear and convincing standard" in analysis. See Alice, 134 S. Ct. at 2359–60; Internet Patents Corp. v. Active Network, Inc., No. 2014-1048, 2015 WL 3852975, at *2–*6 (Fed. Cir. June 23, 2015); DDR Holdings, 773 F.3d at 1255–57. Lower courts are split whether the "clear and convincing" standard applies to eligibility challenges under Section 101. Affinity Labs of Texas, LLC v. Amazon.Com, Inc., No. 6:15-CV-0029-WSS-JCM, 2015 WL 3757497, at *5 n.4 (W.D. Tex. June 12, 2015) (collecting cases).

The parties have not raised any factual disputes in this case for the Court to resolve. In analyzing Lenovo's motions and Tranxition's patents, the Court relies on the undisputed historic

facts set out in the patents themselves, as well as the language of Section 101 and case law interpreting it. Where the question of invalidity depends "not upon factual disputes, but upon how the law applies to facts as given," the clear and convincing evidentiary standard simply does not come into play. <u>Microsoft Corp.</u>, 131 S. Ct. at 2253 (Breyer, J., concurring).

   **3.  Analysis**

      **a.  Step One of the <u>Mayo</u>/<u>Alice</u> Test**

   The first step of the § 101 analysis is to determine "whether the claims at issue are directed to a patent-ineligible concept." <u>Alice</u>, 134 S. Ct. at 2355. Given the nature of the invention at issue in this case, the question is whether the claimed invention is an abstract idea. "The 'abstract ideas' category 'embodies the longstanding rule that an idea of itself is not patentable.' " <u>Id.</u> (quoting <u>Gottschalk v. Benson</u>, 409 U.S. 63, 67 (1972)) (some quotation marks omitted). The Supreme Court has not precisely defined the contours of the category, but it at least includes a "preexisting, fundamental truth . . . about the natural world that has always existed," or a "method of organizing human activity" (e.g., a longstanding commercial practice such as risk hedging). <u>Id.</u> at 2356–57 (citing <u>Bilski</u>, 561 U.S. at 599; <u>Parker v. Flook</u>, 437 U.S. 584, 593 (1978)).

   The first step of the <u>Mayo</u>/<u>Alice</u> analysis essentially requires the Court to ask: what are the claims generally trying to achieve? <u>California Inst. of Tech. v. Hughes Commc'ns Inc.</u>, 59 F. Supp. 3d 974, 993 (C.D. Cal. 2014) (hereinafter "<u>CalTech</u>"); <u>see also</u> <u>Smartflash LLC v. Apple Inc.</u>, No. 6:13CV447-JRG-KNM, 2015 WL 661174, at *8 (E.D. Tex. Feb. 13, 2015) ("The court must first determine the purposes of the claimed inventions."). The "<u>Alice</u> step one analysis can turn on how far a court goes in peeling back a claim's limitations while trying to divine what the claim is really directed to," <u>TriPlay, Inc. v. WhatsApp Inc.</u>, No. CV 13-1703-LPS, 2015 WL

1927696, at *9 (D. Del. Apr. 28, 2015), but the claim's purpose should be stated at a "reasonably high level of generality." Open Text S.A. v. Box, Inc., No. 13-CV-04910-JD, 2015 WL 269036, at *2 (N.D. Cal. Jan. 20, 2015) (citation omitted); see also Ultramercial, 772 F.3d at 715 (holding that "the concept. . . describes only the abstract idea of showing an advertisement before delivering free content" despite presence of other limitations); Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (characterizing abstract idea as "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" despite claim's recitation of specific limitations, such as a scanner).

The purpose of the Primary Claims and Claim 30 is to move a user's custom configuration settings from one computer to another computer. As explained more fully below, this "migration" was a fundamental and widely-utilized process that was performed manually at the time of the invention. Accordingly, the Court finds that both the Primary Claims and Claim 30 are directed at an abstract idea.

Tranxition argues that its invention is more specific than the "abstract idea of transferring settings," Pl. Resp. II at 8–9, but if one looks past the dense language in the patents, it is apparent that the patents describe in very generic and abstract terms the process of transferring settings between computers. See In re TLI Communications LLC Patent Litigation, 2015 WL 627858 at *6 (E.D. Va. Feb. 6, 2015) (explaining that "court must be careful to avoid allowing the typically convoluted language—'patent-ese'—to obfuscate the general purpose and real essence of software patent claims.").

Claim 1 of the '877 patent discloses a method for transferring settings between computers comprising the following steps:

**providing configuration information** about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

generating an extraction plan that **identifies configuration settings to be extracted** from the source computing system, the generating including **providing a list of configuration settings** known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system;

**extracting the active configuration settings** of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information;

generating a transition plan that **identifies configuration settings to be transferred** from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and

for each active configuration setting of the transition plan,
> **retrieving the extracted configuration settings** identified as active configuration settings of the transition plan; and
>
> **transitioning**[2] **one or more of the retrieved configuration** settings from a format used on the source computing system to a format used on the target computing system.

'877 patent, col. 17, ll. 28–62 (emphasis added).

Contrary to Tranxition's assertions, there is nothing at all "specific" about claim 1.

Despite its dense language, claim 1 is a sweeping general description of the migration process—

it is devoid of any detail describing how Tranxition's claimed invention works. In plain terms,

this claim describes the steps any user would take to perform the abstract idea of "migrating"

settings between computers: identify where configuration settings are stored, build a list of

---

[2] At the Markman claim construction hearing, the Court construed "transitioning" as meaning "changing the arrangement of data." Transcript of Markman Hearing, ECF No. 166, at 43.

settings to transfer, fetch the settings from the old computer, and then manipulate the settings to

match the format of the new computer. Claim 1 is the very essence of an "ordered combination

of steps. . . having no particular concrete or tangible form." Ultramercial, 772 F.3d at 715

(finding the patent's claimed eleven-step process for "displaying an advertisement in exchange

for access to copyrighted media" recited an abstract idea).

      Tranxition argues that its claims "disclose a computer-based solution to a uniquely

computer problem—the migration of a computer's complex personality from a source computer

to a target computer," a concept that is "far from a naturally existing abstract concept employed

on a general purpose machine[.]" Pl. Response II at 1. The Supreme Court, Federal Circuit, and

many district courts have often relied on analogies to familiar "real-world" concepts to find that

a software patent embraced an abstract idea. See Alice, 134 S. Ct. at 2356 (finding the patent at

issue embraced the abstract idea of "using a third-party intermediary to mitigate settlement

risk."); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014) (holding that the

creation of a third-party transaction guarantee was an abstract idea that was "beyond question of

ancient lineage."); Ultramercial, 772 F.3d at 715 ("showing an advertisement before delivering

free content."); DietGoal Innovations, Inc. v. Bravo Media LLC, 33 F. Supp. 3d 271 (S.D.N.Y.

2014) ("meal planning").

      But there is no requirement that the idea be "directed to long-standing, pre-technology,

conventional tasks," Pl. Resp. II at 11, before it can be found as "abstract" under step one of the

Alice test. See Internet Patents Corp., 2015 WL 3852975 at *5 (Fed. Cir. June 23, 2015) (holding

that the claimed "idea of retaining information in the navigation of online forms" was abstract);

Smartflash LLC, 2015 WL 661174 at *8 (finding that "conditioning and controlling access to

data based on payment [] is abstract and a fundamental building block of the economy in the

13 – OPINION & ORDER

digital age."); <u>CalTech</u>, 59 F. Supp. 3d 974, 977, 993 (C.D. Cal. 2014) (holding that the general

purpose of the "claims—encoding and decoding data for error correction—[was] abstract"

because the ideas existed before the patents and were well known in the field of binary coding

for modern electronic systems).

     Much like the claims at issue in <u>Internet Patents Corp.</u>, <u>Smartflash</u>, and <u>CalTech</u>, the

concept of migrating custom settings from an old computer to a new computer existed before

Tranxition's invention; the patents themselves admit as much. The "Background of the

Invention" section states that, at the time of the invention in 2004, consumers purchased

approximately 80,000,000 computers each year to replace old computers systems. <u>See</u> '877

patent, col. 1, ll. 27–30. "When a new computer system is used," the patents explain, "a user or a

user's agent typically has to re-configure the new computing system to include configuration

settings that were used on an old computer system. **All but the most rudimentary pieces of 'the**

**migration process' are done by hand. This requires many hours of hands-on time**[.]" '877

patent, col. 2, ll. 2–8. By necessary implication, a significant number of users were manually

migrating settings between an old computer and a new computer.[3] Tranxition's claimed

invention is directed at a practice that was well-known, conventional, and routine at the time of

the invention, and is therefore not directed to patent-eligible subject matter. <u>Internet Patents</u>

<u>Corp.</u>, 2015 WL 3852975 at *5.

     Tranxition argues that the migration process is not a manual one because the "many

hundreds of settings potentially captured and transferred *cannot*, as a practical matter, be

migrated manually." Pl. Resp. II at 2. Kelly Mackin, one of the inventors, also opined that "[i]t

---

[3] Furthermore, that passage suggests that at least some of the "rudimentary pieces" of the migration process were already being completed automatically, which is the primary claimed innovation disclosed in Tranxition's patents. Not only was manual migration well-known and widely practiced at the time of the invention, but arguably automatic migration was as well.

would be impossible in a practical sense to perform a migration of configuration settings to the same extent contemplated by the invention . . . ranging from, depending on the system, 700-10,000 or more settings." Mackin Declaration ("Decl."), ECF No. 238, at ¶ 13. It may be true that a human could not migrate ten thousand settings by hand, but the asserted claims do not require that level of complexity. Claim 1 of the '877 patent claims only "transitioning *one or more* of the retrieved configuration settings." '877 patent, col. 17, ll. 59–62 (emphasis added). The other independent claims similarly claim only "manipulating *at least one* of the extracted configuration settings," '766 patent, col. 17, ll. 66–67 (emphasis added), and "manipulating the (sic) *at least one* extracted program configuration setting." '766 patent, col. 21, ll. 3–4 (emphasis added).

There is no dispute that, prior to the patents, users were engaged in a manual migration process involving at least one configuration setting—as mentioned above, the background of the patents explains that at the time of the invention, "[a]ll but the most rudimentary pieces of 'the migration process' are done by hand." '877 patent, col. 2, ll. 6–8. Whatever complexity Tranxition and Ms. Mackin believes its patents may have envisioned, the patents plainly lay claim to a simple migration involving only one setting. See Planet Bingo, LLC v. VKGS LLC, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (rejecting argument that unclaimed complexity could impart patent eligibility: "At most, the claims require 'two sets of Bingo numbers,' 'a player,' and 'a manager.' . . . [T]he claims fall far short of capturing an invention that necessarily handles 'thousands, if not millions' of bingo numbers or players.").

Dependent Claim 2 of the '877 patent is also aimed at an abstract idea. It claims "[t]he method of claim 1 where the provided configuration information is stored in a personality object." At the Markman hearing, the Court construed "personality object" as

an object-oriented programming object . . . which, one, is not directly associated
with an initialization file; and, two, is not a wizard or other programming module
capable of reading and writing settings containing; three, at least one object with
information about configuration settings; and, four, multiple transition rules for
locating configuration settings.

Transcript of Markman Hearing, ECF No. 166, at 44.

Collecting configuration setting into an "object-oriented programming object" is a
complicated way of describing the abstract idea of collecting computer-readable data into a
group. A "Personality object" is simply the name given to that particular collection of data.
Dependent claims 3 through 10 are different descriptions of the type of information that could be
included in this collection of data. E.g., '877 patent, col 18, ll. 65–67 ("The method of claim 2
wherein the personality object includes desktop, network, Internet, mail, and applications
configuration information."). Again, once one cuts through the "patent-ese," claims 2 and 3
through 10 describe the abstract idea of collecting and organizing generic data in a computer-
readable format. See Cyberfone Sys., LLC v. CNN Interactive Grp., Inc., 558 F. App'x 988, 992
(Fed. Cir. 2014) ("the well-known concept of categorical data storage, i.e., the idea of collecting
information in classified form, then separating and transmitting that information according to its
classification, is an abstract idea that is not patent-eligible."); CyberSource Corp. v. Retail
Decisions, Inc., 645 F.3d 1366, 1375 (Fed. Cir. 2011) (holding that the claimed process to
"manipulate data to organize it in a logical way" was not sufficiently transformative to state a
patent eligible invention).

Claim 11 describes the abstract process of a generic computer installation. '877 patent,
col. 18, ll. 23–27 ("The method of claim 1 including providing the transitioned configuration
settings to a target computing system for installation of the configuration settings on the target
computing system."). Claim 12 actually describes that nothing happens. '877 patent, col. 18, ll.

28–31 ("The method of claim 11 wherein when an application is not installed on the target

computing system, the configuration settings for that application are not installed on the target

computing system."). Finally, claim 15 is a generic and abstract description of data and data

organization. '877 patent, col. 18, ll. 38–41 ("The method of claim 1 wherein the extraction plan

includes an inclusion list of configuration settings to be extracted."). All of these dependent

claims recite abstract ideas with "no particular concrete or tangible form." Ultramercial, 772 F.3d

at 715.

The other independent claims fare no better, and the Court finds they are directed at the

same abstract ideas of claim 1 of the '877 patent. Claim 16 of the '877 patent re-hashes the

identical abstract language of claim 1 for transitioning settings between computers, but adds the

additional abstractions of an unspecified "user interface application," "an extraction application,"

and a "transition application." '877 patent, col. 18, ll. 42–67; col. 19, ll. 1–3. The dependent

claims of claim 16, including claims 17–26 and 28–29, are identical to the claims dependent of

claim 1 in all material respects and fail for the same reasons. Claim 1 of the '766 patent and its

dependent claims describe essentially the same process of the claim 1 of the '877 patent with

different generic verbs. '766 patent, col. 17, ll. 51–67; col. 18, ll. 1–9 (e.g. "displaying,"

"receiving," and "storing"). Finally, claim 42 of the '766 patent and its dependent claims

describes the same abstract processes as claim 1 of the '877 patent and its dependent claims, as

applied to the situation where the operating systems of the two computers are different.

Claim 30 of the '877 patent recites a "computer readable medium containing a data

structure" comprised of "information for locating" the various configuration settings that a user

might desire to migrate to a new computer system. '877 patent, col. 20, ll. 16–34 (e.g.

"information for locating of user preference that affect the appearance and operation of a basic

windowed interface"). Whether read alone or in context, claim 30 is directed at the abstract idea of gathering and organizing data. See Cyberfone, 558 F. App'x at 992 ("the well-known concept of categorical data storage, *i.e.,* the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible.").

    **b.**  **Step Two of the <u>Mayo/Alice</u> Test**

    Having found that both the Primary Claims and Claim 30 are directed at abstract ideas, the analysis moves to <u>Alice</u> step two. The question here is whether the elements of each claim, either individually or as an ordered combination, state an "inventive concept" sufficient to "ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." <u>DDR Holdings</u>, 773 F.3d at 1256 (citing <u>Alice</u>, 134 S. Ct. at 2355).

    "To transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words 'apply it.' " <u>Mayo</u>, 132 S. Ct. at 1294. Additional steps consisting of "well-understood, routine, conventional activity" will not save an otherwise patent ineligible claim. <u>Id.</u> at 1298. "Further, the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant postsolution activity." <u>Intellectual Ventures II</u>, 2015 WL 1941331 at *5 (quoting <u>Bilski</u>, 561 U.S. at 610–11). "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.' " <u>Alice</u>, 134 S. Ct. at 2358 (quoting <u>Mayo</u>, 132 S. Ct. at 1297) (internal citation omitted).

The claims of the '877 and '766 patents, considered both individually and as an ordered combination, fail to state an additional feature that transforms the abstract idea of migrating settings from one computer to another into a patent-eligible invention.

To start, there is little more to claim 1 of the '877 patent than the abstract idea itself. Tranxition insists that claim 1 discloses both meaningful limitations and unconventional steps, but the Court disagrees. The steps described in claim 1 are nothing more than abstract descriptions of rudimentary computer operations that add "nothing of practical significance to the underlying abstract idea." Ultramercial, 772 F.3d at 716 (citing Cybersouce, 654 F.3d at 1370). For instance, "providing configuration information about configuration settings" is simply data gathering. Content Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."). The step of "generating an extraction plan[4] that identifies configuration settings to be extracted from the source computing system" essentially describes making a list. The other claimed limitations such as "extracting," "retrieving," and "transitioning" similarly fail to state an inventive concept. See TLI Communications, 2015 WL 627858 at *12 (explaining that "extraction of . . . information amounts to manipulating data based on inputs from the user, which is yet another conventional computer task.") (citing DietGoal, 33 F. Supp. 3d at 287) (quotation marks omitted).

The primary problem with this claim is representative of the problem with all of the claims in Tranxition's patents at issue here: it is entirely devoid of any detail about how the invention works. Despite Tranxition's insistence that its patents disclose "specific application of concepts for migrating a computer's personality," Pl. Resp. II at 8, upon close examination, the

---

[4] At the Markman hearing, the Court construed "extraction plan" as "a plan for extracting configuration settings that includes a full list of identity units to be located and an exclusion list and an inclusion list." Transcript of Markman hearing, ECF No. 166, at 43.

claims are comprised of little more than synonyms for generic conventional computer processing steps. Nowhere in Tranxition's patents is there an "additional feature[e] that provides any practical assurance" that the method and system it claims to have invented is anything "more than a drafting effort designed to monopolize the [abstract] idea itself." Alice, 134 S. Ct. at 2358 (citing Mayo, 132 S. Ct. at 1297) (internal quotation marks omitted). The claimed limitations are generic conventional computer processing steps stated at a high level of generality, and therefore do not state an inventive concept. Alice, 134 S. Ct. 2357 ("Simply appending conventional steps, specified at a high level of generality [is] not enough to supply an inventive concept.") (citations and quotation marks omitted).

Tranxition's oft-repeated argument that it invented a "computer solution to a computer problem" which is entitled to patent protection is unavailing. See, e.g., Pl. Resp. II at 2, 4, 9, 12–16. Tranxition relies heavily on DDR Holdings, a Federal Circuit case in which that court upheld as valid a patent that recited a method to retain website visitors who clicked on a third party advertisement. DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1258–59 (Fed. Cir. 2014). The patents described a process where a user clicked an advertisement, but rather than transporting immediately to the third-party's webpage, the primary site's web servers displayed a hybrid page that maintained the "look and feel" of the main website while simultaneously displaying information about the advertisement's subject. Id. 1257–58. The Federal Circuit found the claims did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice[.]" Id. at 1258. Instead, the claims specified "how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." Id. The invention was patentable because it was "not merely the routine or conventional use of the Internet," but was

instead "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." Id. at 1257, 1259.

First, the mere fact that Tranxition's patents claim to solve a computer technology problem does not automatically qualify its invention for patent eligibility under DDR Holdings. See id. at 1258 ("We caution, however, that not all claims purporting to address Internet-centric challenges are eligible for patent.").

Second, and more importantly, there is a key difference between Tranxition's claims to an automatic migration process and the claims in DDR Holdings. Tranxition's invention is not "necessarily rooted in computer technology" in the same sense as a server computer specially programmed to display a hybrid web page. True, the problem of transferring user settings from one computer to another did not arise until computers were invented. And true, Tranxition's invention necessarily requires a "source computing system" and a "targeting computing system." The nature of the process that Tranxition's invention claims, however, is a human one. As explained above, the patents themselves explain that migration is a manual process predating the invention:

> Another problem is that there is no easy way to transfer old configuration settings to a new computing system. **When a new computer system is used, a user or a user's agent typically has to re-configure the new computing system to include configuration settings that were used on an old computer system.** All but the most rudimentary pieces of "the migration process" are **done by hand. This requires many hours of hands-on time** with lost productivity and a "start from scratch" resignation.
> . . .
>
> Yet another problem is that configurations settings on an old computing system may be stored in a new location, in a new file, or in new format on a new computing system. **An old configuration setting may have to be translated or otherwise modified** to provide the same results on the target computing system. **Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration.**

'877 patent, col. 2, ll. 1–9, 13–20. The patents then claim to perform the manual migration "automatically":

> It is . . . **desirable to provide an automatic migration** of configuration settings from an old computing system to a new computing system **without using a time consuming manual migration process**.

'877 patent, col. 2, ll. 38–44.

The activity at issue in DDR Holdings, by contrast, could only be performed by a computer. The process was "necessarily rooted in computer technology" because there is no manual process that could achieve the same result—there is no way for a person to display a hybrid website.

There is, however, a way for a human being to manually transfer settings from one computer to another. First, the user would locate the settings he or she wanted to transfer from the old computer. Next, he or she would "extract" those settings from the old computer, and then turn to the new computer and locate where the similar setting is stored there. Finally, the user would "transition" the old setting to the new system by applying it.

Of course, this is exactly the process described in Tranxition's patents, except Tranxition claims to perform the migration "automatically" with a computer. '877 patent, col. 2, ll. 38–44; col. 17, ll. 28–31. Stating a manual process and then claiming to "do it with a computer" is not an inventive concept that can confer patent eligibility. Alice, 134 S. Ct. at 2358 (holding that the addition of an "instruction to 'implemen[t]' an abstract idea 'on a computer' . . . cannot impart patent eligibility."); see also DDR Holdings, 773 F.3d at 1259 (explaining that the claims were patentable because "they do not broadly and generically claim 'use of the Internet' to perform" a long-standing practice).

Tranxition's patents explain that one of primary problems with the manual migration process is that it can take a long time. E.g. '877 patent, col. 1, ll. 58–61 ("The average user . . .

may have to spend large amounts of time reading documentation or help screens to figure out where the configuration settings are stored"); '877 patent, col. 2, ll. 6–9 (performing the migration process "by hand . . . requires many hours of hands-on time with lost productivity"). The other problem is that the potential complexity of the migration could lead to errors. '877 patent, col. 2, ll. 18–20 ("Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration."); '877 patent, col. 2, ll. 28–31 ("a manual migration process . . . can decrease quality of service on the new computing system since one or more configuration settings may be missed . . . and not be transferred"). Thus, the patents explain, "[i]t is . . . desirable to provide an automatic migration of configuration settings . . . without using a time consuming manual migration process." '877 patent, col. 2, ll. 41–45.

    Using a generic computer to perform a manual task more efficiently and accurately than a human could is not a patentable idea, and courts have routinely invalidated patents asserting such claims. See, e.g., MySpace, Inc. v. GraphOn Corp., 672 F.3d 1250, 1267 (Fed. Cir. 2012) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101."); E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., No. 12-CV-517-LM, 2015 WL 226084, at *7 (D.N.H. Jan. 15, 2015) amended in part, No. 12-CV-517-LM, 2015 WL 925614 (D.N.H. Mar. 3, 2015) ("The lesson of Alice and . . . other cases . . . is that when the alleged innovation involves the use of a generic computer to do what such computers typically do, i.e., speed up a process by eliminating the need for human activity, that innovation is not an invention eligible for patent protection."); Tenon & Groove, LLC v. Plusgrade S.E.C., No. CV12-1118-GMS-SRF, 2015 WL 82531, at *5 (D. Del. Jan. 6, 2015) report and recommendation adopted, No. CV 12-1118-GMS-SRF, 2015 WL 1133213 (D.

Del. Mar. 11, 2015) ("However, the specifications themselves reveal that the processes may be performed mentally by a human, expressly stating that the inventions "eliminate [ ] manual, time-consuming processes and replace [ ] those with an efficient, automatic process. . . . The Federal Circuit has stressed that merely using a computer to perform more efficiently what could otherwise be accomplished manually does not confer patent-eligibility.") (citing Bancorp Servs. LLC v. Sun Life Assur. Co. of Can., 687 F.3d 1266, 1279 (Fed. Cir. 2012) (additional citation and quotation marks omitted).

The claims dependent on claim 1 similarly fail to disclose an inventive concept. Claim 2 discloses "[t]he method of claim 1 where the provided configuration information is stored in a personality object." '877 patent, col. 17, ll 63–64. Claims 3 through 10 then disclose the types of data that could be stored in this "personality object," including user preferences, email settings, and application configuration information. '877 patent, col. 17, ll. 65–67; col. 18, ll. 1–23. These claims, when read together, disclose the creation a list of where configuration information can be found, and grouping that information as a collection of data (i.e., an "object") that the programmer can manipulate through software. These claims fail to state an inventive concept because they merely describe in generic and abstract terms how to perform the first steps in the manual migration process—locate user settings to transfer and collect that information for later use—on a computer. Alice, 134 S. Ct. at 2358 (the addition of an "instruction to 'implemen[t]' an abstract idea 'on a computer' . . . cannot impart patent eligibility."); CyberSource, 654 F.3d at 1370 (holding the claimed limitation was "mere collection and organization of data," and was not sufficient to confer patent eligibility).

The other claims dependent on claim 1 similarly do not provide an inventive concept. Claim 11 describes a generic installation; claim 12 actually describes a situation where no

settings are transferred at all; claim 15 is another generic list of "configuration settings to be extracted." '877 patent, col. 18, ll. 23–41.

Independent claim 16 of the '877 patent discloses a "computer system" for implementing the method claim of claim 1. The language of claim 16 is nearly identical to the language in claim 1 and recites the same abstract ideas at a high level of generality (e.g. "extracting the active configuration settings," "transitions one or more of the retrieved settings"), except that claim 16 adds "a user interface application," "an extraction application," and a "transition application." '877 patent, col. 18, ll 42–67; col. 19, ll. 1–3. The disclosure of these generic applications does not add any meaningful, practical limitation to the abstract idea of performing an existing manual migration process on a computer.  Alice, 134 S. Ct. at 2360 ("[T]he system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."). The claims dependent on claim 16 are identical in all material respects to the claims dependent on claim 1, and thus they fail to state an inventive concept for reasons previously explained.

Independent claim 30 of the '877 patent recites a "data structure" that contains "information for locating" the various configuration settings to be transferred. '877 patent, col. 20, ll. 16–34. This disclosed activity is, again, nothing more than data gathering and organization—a wholly conventional and widely-practiced computer function that does not add an inventive concept. E.g., Content Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Tranxition offered the declaration of Kelly Mackin in an effort to show an inventive concept. Ms. Mackin opined that the "Personality object . . . [was] one of the central inventive

contributions that the '877 patent provides. It was unique when the invention was conceived to use a data structure and the elements in Claim 30 in combination to store and apply information about locating multiple, disparate, and non-uniform-in-format configuration settings." Mackin Declaration ("Decl."), ECF No. 251, at ¶ 9. She also claims that the "Personality object carries the critical responsibility of bridging know how (for locating the configuration settings) and the application's data engine (the automatic transition system)." Id. at ¶ 8. But there is nothing unique or inventive about using a "data structure" to organize a collection of information—that is what a computer does. As cited throughout this Opinion, courts have repeatedly rejected the idea that merely "organizing" or "manipulating" data on a computer is somehow inventive.

Ms. Mackin's assertion that the personality object "bridged" the gap between the information and the software is similarly unhelpful. Like the claims in the patents, it is a broadly sweeping abstract assertion devoid of any detail explaining how the claimed invention works. Her declaration is another iteration of the same idea: performing the previously-practiced manual migration of settings between computers more quickly and efficiently with a computer. That is not an inventive concept. MySpace, 672 F.3d at 1267 ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.").

The independent and dependent claims of the '766 patent also fail to state an inventive concept. Claim 1 of the '766 patent is essentially the same as claim 1 of the '877 patent, except that the '766 patent uses slightly different verbiage, such as "*displaying* an indication of the configuration settings that can be extracted," "*receiving* a selection," "*manipulating* at least one of the extracted settings," and "*storing* the extracted configuration settings." '766 patent, col. 17, ll. 51–67; col. 18, ll. 1–9 (emphasis added). These are routine, conventional processing steps that

any generic computer can perform, and are not, therefore, an inventive concept. See CyberSource, 654 F.3d at 1375 (claims that recited "mere manipulation or reorganization of data" were not sufficient to confer patent eligibility); TLI Communications, 2015 WL 627858 at *12 (holding that receiving, extracting, and storing data was conventional computer activity and not an inventive concept.). Dependent claims 2 and 3 disclose a generic installation, and dependent claims 5 through 11 simply describe different types of configuration data (e.g. "7. The method of claim 1 wherein the extracted configuration settings include browser bookmarks"), and those too fail to state an inventive concept. '766 patent, col. 18, ll. 8–14, 15–28, 36–37. Independent claim 42 describes the migration process using the same generic language as the other independent claims, but applies the migration to two computers with different operating systems; its dependent claims 43 and 44 simply describe different types of generic data. Again, the language in these claims is little more than an exercise in creatively re-naming conventional computer functions.

Tranxition points to an "exemplary embodiment" and other portions of Ms. Mackin's declaration to show more specific and concrete applications of the claimed invention. See Pl. Resp. II at 8–9, 22; Mackin Decl., at ¶ 10. But the analysis of patent eligibility under Section 101 must focus on the language of the claims themselves, not the additional detail set forth in the specification, or the inventor's testimony about the meaning of the patent claims. Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may preempt only that which the claims encompass, not what is disclosed but left unclaimed."); Howmedica Osteonics Corp. v. Wright Medical Technology, Inc., 540 F.3d 1337, 1346–47 (Fed. Cir. 2008) (rejecting as irrelevant inventor testimony regarding the scope of the claim language).

Tranxition attempts to manufacture an inventive concept by characterizing the "source computing system" and "target computing system" described in its patents as "special purpose" computers programmed by its software to perform a specific function. Pl. Resp. II at 18–19 (citing In re Alappat, 33 F.3d 1526, 1545 (Fed. Cir. 1994)). There is nothing unique, innovative, or "special" about these computing systems. The "source" is the computer from which settings are taken, and the "target" is the computer to which those settings are applied. The systems themselves are passive in the process; they do not serve any particular purpose, much less a special one. The "source" and "target" systems are generic computers to which the abstract idea of migrating settings is applied, and that is not a patentable concept. See Alice, 134 S. Ct. at 2358 ("recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."). Moreover, if given effect, Tranxition's argument would essentially validate every software patent as a matter of course because all software requires computer implementation. See Intellectual Ventures II, 2015 WL 1941331, at *12 (rejecting same argument by patent-holder based on Alappat that "programming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.").

### c.  Preemption Concerns

There is an additional rationale that supports the Court's determination that Tranxition's patents are invalid. Underlying the threshold analysis of patentability under Section 101 is the need to protect the basic tools of discovery—natural phenomena, mental processes, and abstract ideas—from monopolization or preemption through patent. See Mayo, 132 S. Ct. at 1293–94, 1301; Alice, 134 S. Ct. at 2354 (stating that "the concern that drives" the exclusion of the "building blocks of human ingenuity" from patent eligibility is "one of preemption."); see also

Tenon & Groove, 2015 WL 1133213, at *4 (explaining that "[t]he focus on preemption goes hand-in-hand with the inventive concept requirement: they ensure that the patentee is not granted a disproportionate monopoly over the 'building blocks of human ingenuity.' ") (quoting Alice, 134 S. Ct. at 2354–55).

A patent over Tranxition's claimed process risks preempting the abstract idea of migrating settings from one computer to the other. The methods and processes described in Tranxition's patents are extraordinarily rudimentary and are stated at such a high level of generality that they threaten to foreclose any attempt to migrate settings between computers. As explained previously, the claimed invention only requires a *single* setting to be "transitioned" from the old computer to a new computer. In simple terms, Tranxition claims a patent over any method that locates configuration settings, makes a list of settings to change, and then applies one of those settings to the new system. The potential preemptive effect is sweeping.

Tranxition's claims that this is a "computer-only" problem does not alleviate the concern that the patent essentially seeks to foreclose innovation on an abstract idea in that particular field. Amdocs (Israel) Ltd. v. Openet Telecom, Inc., No. 1:10CV910 LMB/TRJ, 2014 WL 5430956, at *4 (E.D. Va. Oct. 24, 2014) ("The preemption concern must also be considered in light of the field to which the patent is directed. If the claimed abstract idea 'has no substantial practical application except in connection' with the particular field claimed, then allowing a claim to that idea, even if limited to a particular field, 'would wholly pre-empt' the idea and 'in practical effect would be a patent on the [idea] itself.' ") (quoting Gottschalk, 409 U.S. at 71–72).

Tranxition argues that its claimed invention does not present substantial preemption concerns because the claims "recite specific methods and systems to migrate a computer's personality from a source computer to a target computer." Pl. Resp. II at 33. However, as

explained throughout this Opinion, the language in Tranxition's patents is not specific at all; it describes very basic computer functionality with generic, if somewhat complicated, terminology. The Court struggles to grasp what other process might be used to transfer settings from one computer to another, other than Tranxition's claimed method of identifying the available settings, choosing what settings to transfer, and then "transitioning" those settings to the other machine.

The potentially extensive preemptive scope of Tranxition's patents was demonstrated, at least in part, during the discovery process in this case. Not only did Tranxition seek information about Lenovo's products that were designed to perform the "migration" of settings between systems, but it also sought to discover information about Lenovo's "Rescue and Recovery" product. Pl. Mot. to Compel Discovery Regarding Lenovo's Infringing Product "Rescue and Recovery," ECF No. 248. Rescue and Recovery, Lenovo insisted, was designed as a "software tool used to back-up files from a computer hard disk so that they can be restored later if needed . . . . It is not designed to manipulate files from . . . a source computer to a . . . target computer." Def. Resp. to Pl. Mot. to Strike, ECF No. 257, at 21. Through an expert, Tranxition was able to demonstrate how a user could easily manipulate the Rescue and Recovery software program to migrate Internet browser application settings from one computer to another. Decl. of Ronen Levy, ECF No. 245, at 4–16. Although not designed for migration, it was clear that Rescue and Recovery could be used to migrate settings, and thus it might infringe Tranxition's patents.

The conclusion to draw is that the claims in Tranxition's patents not only threaten to preempt the "migration process" generally, but they are so broad that they could preempt the entire field of computer data backup and restore, at least insofar as the programs written to implement backup and restore are capable of taking settings from one computer and applying

them to another. Without a sufficient "inventive concept" that limits Tranxition's patents to

something narrower than a claim to the abstract idea of migrating settings between computers,

Tranxition's '877 and '766 patents present substantial preemption concerns, and are, therefore,

invalid.

**ORDER**

For the reasons stated, Lenovo's motion for partial summary judgment [229] and motion

for summary judgment [234] are granted. All other outstanding motions are denied as moot.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015.

MARCO A. HERNÁNDEZ
United States District Judge